**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: ARTIFICIAL INTELLIGENCE MINOR SEXUAL EXPLOITATION LITIGATION | MDL Docket No. __1:26-P-49___ |

**MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS UNDER 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, Minor Plaintiff Jane Doe ("Movant" or "Jane Doe") 1 submits this memorandum in support of her motion for transfer and consolidation of all actions identified in the Schedule of Actions (Exhibit A), as well as any cases subsequently filed involving similar common questions of fact, to the United States District Court for the Western District of Arkansas with Chief Judge Timothy L. Brooks. Transfer of these cases is well within the scope of 28 U.S.C. § 1407(a): (1) the actions involve common questions of fact, (2) consolidation would serve the convenience of the parties and witnesses, and (3) consolidation would promote the just and efficient conduct of this litigation.

## BACKGROUND

Defendants x.AI Corp, x.AI, LLC, x.AI Holdings LLC, and/or X Corp. have created an artificial-intelligence monster—Grok/Grok Imagine—that is capable of generating child sexual abuse material ("CSAM"), non-consensual intimate imagery, and sexually explicit deepfakes of real, identifiable children and minors, such as Jane Doe. Every 41 seconds, Grok generates

sexualized images of children.[1] These cases are not about an unforeseen technological accident. This is about a company that built an artificial intelligence machine to generate sexualized images of real children, marketed that capability as a competitive advantage, and kept it running even after state law enforcement, legislators, and child-safety researchers told Defendants exactly what it was doing to real children, like Jane Doe.

xAI Corp., x.AI, LLC, x.AI Holdings LLC, and X Corp. (collectively "xAI" or "Defendants") own, develop, and operate Grok, a generative artificial intelligence chatbot and image/video generator integrated directly into the social media platform X, which Defendants themselves also control. Grok is built on diffusion-model technology capable of taking an ordinary photograph of a real person—a school photo, a family snapshot, a portrait session—and generating an entirely new, synthetic image or video of that same identifiable person nude or engaged in sexual conduct. Unlike traditional photo-editing software, Grok does not crop or alter the uploaded file, rather, every pixel of the output is calculated by Defendants' own model, in real time, on servers Defendants own and control. Every image and video referenced within each case delineated in Exhibit A was manufactured and created using the same artificial intelligence program (Grok), running the same architecture, and owned by the same corporate Defendants.

xAI is an artificial intelligence company founded by Elon Musk in 2023 to develop and commercialize frontier generative artificial intelligence technologies capable of competing with the world's most advanced AI systems. From the day that Elon Musk announced xAI, he told the world that his artificial intelligence would be different from every other AI on the market: it would not be safe, cautious, or filtered, it would be "rebellious." On November 4, 2023, Defendants

---

[1] Grok Floods X With Sexualized Images of Women and Children, CENTER FOR COUNTERING DIGITAL HATE, https://counterhate.com/research/grok-floods-x-with-sexualized-images/ (Jan. 22, 2026).

announced their new chatbot, Grok. Defendants' Grok and/or Grok Imagine is a generative AI model capable of generating images and videos.

In or around August 2025, Defendants made a deliberate business decision to build and launch "Spicy Mode," an opt-in configuration of Grok Imagine that Defendants designed and marketed to generate sexually explicit imagery of real people. While every other major generative-AI provider has refused, as a matter of policy and engineering, to generate sexual content depicting real people, Defendants built Grok to do exactly that, and they built in no reliable mechanism to exempt children from the capability.

The consequences were immediate and measurable, so much so that these cases will continue to occur and be re-litigated in districts across the country for years to come, requiring common documentary evidence, depositions, and other related discovery. Between December 29, 2025 and January 8, 2026 (an eleven-day window), researchers at the Center for Countering Digital Hate analyzed a sample of 20,000 of approximately 4.6 million images that Grok generated during that period, and estimated that Grok produced roughly three million sexualized images, more than fifty percent of its total output, including an estimated 23,000 images depicting children.[2] This means that Grok creates a sexualized image of a child every 41 seconds; Grok creates 87 CSAM images per hour, and 2,091 CSAM images per day. *Id*.

That volume did not escape regulators' notice. On January 14, 2026, California Attorney General Rob Bonta opened a formal investigation into Defendant xAI over Grok's mass production of nonconsensual sexual imagery of women and children, and two days later he sent xAI a cease-and-desist letter demanding that the company immediately stop creating and distributing this

[2] *See* Grok Floods X With Sexualized Images of Women and Children, https://counterhate.com/research/grok-floods-x-with-sexualized-images/ (Jan. 22, 2026).

material.[3] One week after that, on January 23, 2026, a bipartisan coalition of thirty-five state attorneys general sent xAI a formal letter warning that Grok "merit[ed] special attention" because it both promoted and facilitated the mass, public dissemination of nonconsensual intimate imagery and "made it all as easy as the click of a button." *See* Exhibit B, Letter to xAI authored and endorsed by 35 state Attorneys General (January 23, 2026). The attorneys general wrote that Grok had "altered images of children to depict them in minimal clothing and sexual situations," "produced photorealistic images of 'very young' people engaged in sexual activity," and that "[t]he ability to create nonconsensual intimate images appeared to be a feature, not a bug" of Defendants' product. *Id*. Regulators in the United Kingdom,[4] Japan,[5] and the European Union[6] opened parallel inquiries, and Malaysia and Indonesia temporarily blocked access to Grok altogether. [7]

Despite this cascade of warnings, from regulators, from researchers, and from law enforcement officials, Defendants did not disable Grok's underlying CSAM generating capabilities. Instead, Defendants made a corporate decision to restrict Grok's image generation

[3] Attorney General Bonta Launches Investigation into xAI, Grok Over undressed, Sexual AI Images of Women and Children, https://oag.ca.gov/news/press-releases/attorney-general-bonta-launches-investigation-xai-grok-over-undressed-sexual-ai (January 14, 2026).

[4] *See e.g.*, Engadget, "UK regulator Ofcom opens a formal investigation into X over CSAM scandal" (Jan. 12, 2026) https://www.engadget.com/big-tech/uk-regulator-ofcom-opens-a-formal-investigation-into-x-over-csam-scandal-120000312.html; CyberScoop, "British regulator Ofcom opens investigation into X" (Jan. 12, 2026) https://cyberscoop.com/ofcom-opens-investigation-into-x-over-nonconsensual-deepfakes/; CMS Law, "Grok in deep trouble over deepfakes? What Ofcom's recent investigation means for online platforms" (Mar. 20, 2026) https://cms.law/en/gbr/legal-updates/grok-in-deep-trouble-over-deepfakes-what-ofcom-s-recent-investigation-means-for-online-platforms.

[5] *See e.g.*, Bloomberg, "Musk's Grok AI Faces Scrutiny From Japan Over Sexualized Images" (Jan. 15, 2026) https://www.bloomberg.com/news/articles/2026-01-16/musk-s-grok-ai-faces-scrutiny-from-japan-over-sexualized-images; Asahi Shimbun, "Japan probing Musk's Grok AI service over inappropriate images" (Jan. 15, 2026) https://www.asahi.com/ajw/articles/16289906.

[6] Al Jazeera, "EU probes Musk's Grok AI feature over deepfakes of women, minors" (Jan. 26, 2026) https://www.aljazeera.com/news/2026/1/26/eu-launches-probe-into-grok-ai-feature-creating-deepfakes-of-women-minors.

[7] NPR, "Malaysia, Indonesia become first to block Musk's Grok over AI deepfakes" (Jan. 12, 2026) https://www.npr.org/2026/01/12/nx-s1-5674660/malaysia-indonesia-block-grok-ai-deepfakes; Fortune/AP, "Grok blocked in Malaysia and Indonesia as sexual deepfake scandal builds" (Jan. 12, 2026) https://fortune.com/2026/01/12/grok-blocked-in-malaysia-and-indonesia-as-sexual-deepfake-scandal-builds.

functionality to paying subscribers, thereby converting a known CSAM-generation risk into a revenue stream.

Defendants' knowledge and notice is not a mere inference, it is a matter of public record that will be common to every action.

The harm suffered by Jane Doe, and all of the other pending Doe plaintiffs and minors who haven't yet initiated legal action, was avoidable and detectable. Grok generated hundreds, if not thousands, of new, unique CSAM images and videos depicting ten (10) year-old Jane Doe's entire nude body and/or engaging in sex acts that never occurred. Jane Doe's family will forever live with the knowledge that this synthetic media material, which is indistinguishable from authentic sexual abuse imagery, may exist indefinitely, be copied indefinitely, be used by Grok as reference material indefinitely, and could resurface at any point for the rest of Jane Doe's life. The harm is not a momentary injury that fades with time. It is a wound with no natural end point. Unlike most injuries the law is asked to remedy, this one cannot be contained, retracted, or outrun—once created, this material can circulate forever, and its victims will spend the rest of their lives not knowing where it has gone or who has seen it. With knowledge of the lasting effects, Jane Doe's parents have been unable to sleep and unable to eat due to stress over this, the weight of this has been so consuming that her mother was prescribed medication to help cope.

Unfortunately, Jane Doe's case is not an aberration, it is the leading edge of a wave of cases to come. There are currently twenty-six (26) similar Jane and John Doe plaintiffs whose images and likeness were used by Defendants' Grok and/or other generative AI technology to create CSAM and/or pornographic images and videos. *See* Exhibit A, Schedule of Actions. Approximately seventeen (17) of these plaintiffs causes of action stem from activities in Arkansas. At least, Fourteen (14) of these plaintiffs live in or around the Western District of Arkansas. *See*

Exhibit A; see *e.g., Jane Doe, by and through her Legal Guardian Parents, John Roe and Jane Roe v. X.AI Corp., et al.,* No. 4:26-cv-00750-TLB (W.D. Ark.); *Jane Doe 3, by and through her Legal Guardian Parent, Jane Roe 3 v. X.AI Corp., et al.*, No. 5:26-cv-05193-TLB (W.D. Ark.); *John Doe, by and through his Legal Guardian Parent, John Roe 4 v. X.AI Corp., et al.*, No. 5:26-cv-05204-TLB (W.D. Ark.); *Jane Doe I, et al. v. X.AI Corp., et al.*, No. 3:26-cv-08567-SK (N.D. Cal.) (6 "Named" Doe Plaintiffs o/b/o putative class); *Jane Doe 1, a minor, by and through her Next Friend Jane Doe 3; Jane Doe 2, a minor, by and through her Next Friend Jane Doe 3; and Jane Doe 3 v. X.AI Corp., et al.*, No. 5:26-cv-05231-TLB (W.D. Ark.); *Jane Doe, a minor, by and through her Next Friends Jane Roe and John Roe v. X.AI Corp., et al.*, No. 5:26-cv-05232-TLB (W.D. Ark.). The remaining twelve (12) plaintiffs live in various states across the country, including three (3) in South Carolina, one (1) in Texas, three (3) in Tennessee, one (1) in Wyoming, one (1) in Wisconsin, three (3) in Pennsylvania, and one (1) in California. *See* Exhibit A.

Eight (8) of these actions are pending within the Western District of Arkansas in Chief Judge Brooks' Court. The consolidated and Class Complaints in California and all pending cases in Arkansas District Courts include the same Defendants, x.AI Corp., x.AI LLC, and x.AI Holdings LLC. *Id*. One of the consolidated complaints also includes additional Defendants Stability AI U.S. Servs. Corp., and Stability AI, Inc.

***Plaintiffs.*** In all of the pending cases referenced in Exhibit A, the Doe plaintiffs are minors or were minors at the time, and are victims of Grok's and/or other AI's generation of thousands of CSAM images and videos depicting their nude bodies. The pattern is the same in case after case: Grok's own model, Defendants' proprietary architecture, running on Defendants' own servers, applying Defendants' own design and content-policy choices, used a real photograph of a real child

to generate new, synthetic CSAM. AI created these sexually explicit synthetic images and videos of these minors without their knowledge or consent.

***Defendants***. x.AI Corp. is a Nevada corporation with its principal place of business at 1450 Page Mill Road, Palo Alto, California, with additional offices in San Francisco. As described above, xAI owns, operates, designs, markets, and distributes Grok and Grok Imagine. It was founded by Elon Musk in 2023 and released its first chatbot, Grok-1, in November of that year, advertised as willing to "answer spicy questions that are rejected by most other AI systems." xAI has since raised more than $10 billion in funding and rapidly iterated the product through Grok-2, Grok-3, and Grok-4 before releasing Grok-4.5 in July 2026. Unlike its principal competitors, xAI built no reliable age-verification or age-estimation safeguard into Grok, and its own published system prompt instructed the model to "assume good intent" and treat the words "teenage" or "girl" as not necessarily indicating an underage subject. Those instructions when paired with xAI's decision to permit sexually explicit output, leave no meaningful barrier between an adult user and a real child's photograph.

x.AI, LLC is a Nevada limited liability company and wholly owned subsidiary of x.AI Corp. x.AI Holdings LLC is a Nevada corporation with a principal address at 1450 Page Mill Road, Palo Alto, California. It is the corporate parent of x.AI Corp. and, as of February 2, 2026, became itself a wholly owned subsidiary of SpaceX Corp. Accordingly, the entire Grok product line, along with the platform that distributes it, is under common ownership with Elon Musk's other companies.

X Corp. is a Nevada corporation that owns, operates, designs, markets, and distributes the social media platform X (formerly Twitter), through which Grok is embedded and disseminated to hundreds of millions of users. In March 2025, Musk merged X into xAI in an all-stock transaction

valuing X at $33 billion, which formally combined the company that made Grok with the platform that supplies its real-time data feed, its user base, and the public timeline. X Premium and Premium+ subscribers receive automatic access to Grok bundled into their platform subscription, and it was on X's own public feed, not a private application, that Grok's synthetic CSAM was generated, posted, and viewed by the public before Defendants restricted the feature to paying subscribers.

Defendants collectively own, operate, design, develop, market, and monetize Grok. Each pending action listed in Schedule A includes this corporate family in varying combinations.

## LEGAL STANDARD

Transfer and consolidation under 28 U.S.C. § 1407 is appropriate when actions pending in different judicial districts involve similar questions of fact, and consolidated and centralized pretrial proceedings would "be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

When deciding whether to transfer a case under Section 1407, the Panel typically considers whether centralization would (1) eliminate duplicative discovery, (2) avoid conflicting pretrial rulings and schedules, (3) reduce litigation costs, and (4) conserve the resources of the parties, counsel, witnesses, and the judiciary. *See* Manual for Complex Litigation (Fourth) § 20.131 (2004) (citing *In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968)).

## ARGUMENT

### I. TRANSFER AND CONSOLIDATION IS APPROPRIATE UNDER 28 U.S.C. § 1407

Consolidation of pretrial proceedings into an MDL is appropriate where (1) actions pending in different federal courts involve "one or more common questions of fact," and (2) consolidation

"will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Both elements are met here.

A. The Actions Share Common Questions of Fact.

Section 1407 asks only whether the Actions share common questions of fact, not whether they are identical. *See In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005); *see also In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007). That some facts will vary from plaintiff to plaintiff is not a reason to deny transfer, it is the reason MDLs exist. The Panel has repeatedly centralized litigation on precisely this showing. *See e.g., In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 637 F. Supp. 3d 1377, 1378 (J.P.M.L. 2022). As the Panel explained in confronting the last wave of burgeoning technology related mass litigation, "[t]hat individualized factual issues may arise in each action does not—especially at this early stage of litigation— negate the efficiencies to be gained by centralization." *Id*.

Each pending Action (Schedule A) arises from the same underlying conduct, Defendants' design, training, and deployment of Grok, and each will require resolving the same core factual questions about what Defendants knew about the risks its Grok model posed, when they knew it, and what safeguards they chose not to build.

Every Action (Schedule A) here alleges the same core facts: that Defendants designed Grok, specifically "Spicy Mode," to generate sexually explicit synthetic imagery of real, identifiable people from ordinary reference photographs; that Defendants knew or should have known this capability would be used to generate CSAM of real children; and that Defendants failed to implement feasible safeguards that every other major AI developer had already adopted. Each Doe plaintiff has alleged these same facts. The result is that each minor Doe plaintiff had synthetic

images or videos of them created by Grok without their consent or knowledge. Other common factual issues include, without limitation: (1) Defendants' actual and constructive knowledge that Grok was generating CSAM at scale, as documented in the Center for Countering Digital Hate's research, the thirty-five-state Attorneys General letter, and the California Attorney General's cease-and-desist letter; (2) the technical design of Grok and Spicy Mode, including the system-prompt instructions directing the model to "assume good intent" toward prompts referencing "teenage" or "girl"; (3) the reasonableness of Defendants' decision to restrict, rather than disable, the offending functionality after public exposure; (4) Defendants' compliance with mandatory CSAM-reporting obligations to NCMEC; and (5) Defendants' public representations regarding Grok's safety.

This common set of facts and circumstances gives rise to the nearly identical legal claims pled in the Actions—including federal Statutory Claims under Masha's Law, 18 U.S.C. § 2255(a), arising from Defendants' violations of Chapter 110 of Title 18; fraud; negligence; design defect; and failure to warn.

While the facts specific to each plaintiff's exploitation may differ slightly (ie. the number of images or videos made, the age of the child, etc.), the differences in "the various circumstances of plaintiffs' alleged assaults and their injuries" do not preclude transfer where "sufficient common issues" exist regarding a defendant's knowledge, safety representations, and design choices. *In re Uber Techs., Inc.*, 699 F. Supp. 3d 1396, 1398 (J.P.M.L. 2023); *see also Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*, 131 F.4th 661, 670 (9th Cir. 2025) (explaining that a defendant's "corporate policies and practices…present a common factual question…because all plaintiffs will no doubt seek discovery into what those policies were"). The same logic controls here. Every plaintiff will seek discovery into the same model architecture, the same Spicy Mode rollout decisions, and the same corporate response to the same regulatory warnings, regardless of

which entity within the xAI corporate family happens to be named, or whether a given complaint also names other defendants (ie. Stability AI) over a separate, narrower theory concerning a different product.

### B. Centralization Will Serve the Convenience of the Parties and Witnesses, and Promote the Just and Efficient Conduct of the Litigation.

#### 1. *Centralization will eliminate duplicative discovery.*

As every Action pending here (Schedule A) arises from the same product(s) and the same corporate conduct, and share the same basic theories of liability, underlying factual allegations and injuries, the plaintiffs will seek largely overlapping discovery on these issues. Without centralization, the parties will otherwise be forced to litigate the same discovery disputes, take the same depositions, and produce the same documents in every district where an Action is pending. This risk is precisely what Section 1407 exists to prevent, and iterates the need for centralization. *See In re: Pilot Flying J Fuel Rebate Contract Litig. (No. 11)*, 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014) (centralization "will avoid repetitive depositions of [Defendant's] officers and employees and duplicative document discovery"); *In re: Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1382 (J.P.M.L. 2004) (transfer "offer[s] the benefit of placing all actions…before a single judge who can structure pretrial proceedings…while ensuring that common parties and witnesses are not subjected to discovery demands that duplicate activity"); *In re: Starmed Health Pers. FLSA Litig.*, 317 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004) (transfer was ordered to "eliminate duplicative discovery" and "conserve the resources of the parties").

Proceeding separately in potentially a dozen or more districts would require Defendants' officers, engineers, and safety personnel to sit for duplicative depositions and would require production of the same documentation, source code, and internal communications again and again in every court where an Action is or will be pending.

Centralization eliminates that duplication and "offer[s] the benefit of placing all actions in this docket before a single judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands that duplicate activity." *In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1382 (J.P.M.L. 2004); see also *In re Pilot Flying J Fuel Rebate Contract Litig. (No. 11)*, 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014) (centralization "will avoid repetitive depositions of [defendants'] officers and employees and duplicative document discovery").

2. *Centralization will avoid inconsistent pretrial rulings on novel, recurring, and potentially unsettled legal questions.*

Centralization will avoid inconsistent rulings on the same or overlapping legal issues. *See In re Protegrity Corp. & Prointegrity USA, Inc., Patent Litig.*, 84 F. Supp. 3d 1380, 1381 (J.P.M.L. 2015) (stating that "centralization will eliminate the potential for inconsistent rulings on several pending motions to dismiss"). The Actions here present numerous common legal issues that are neither straightforward nor settled, and that carry a serious risk of conflicting results if the Actions proceed independently.

Every Action will require the presiding court to resolve, potentially for the first time, how the federal CSAM statutes and Masha's Law apply to a corporate defendant whose own artificial-intelligence system generated the unlawful material at issue—a question no statute drafted before generative AI existed was written to answer, and one on which no two courts should be permitted to reach different results for children harmed by the identical or similar product. Every court will face the same novel product-liability questions — whether, and under what theory, a generative AI model constitutes a "product" for purposes of state law. *Compare In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 838–53 (N.D. Cal. 2023) (addressing analogous, unresolved product-liability theories against technology platforms). Left to potentially

a dozen separate courts, these threshold, potentially case-dispositive questions will be decided independently and risk being decided inconsistently.

Centralization will also avoid inefficient and conflicting rulings on the scope of discovery itself, including "which witnesses [are] to be deposed and under what circumstances, which ESI sources [are] to be searched, which search terms or other methods [are] to be used, and which documents [will] be produced." *Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*, 131 F.4th 661, 671 (9th Cir. 2025). Centralization is warranted because it will allow a single court to resolve these common legal and discovery questions consistently and efficiently for every Action. *See In re Soc. Media Adolescent Addiction*, 637 F. Supp. 3d at 1378 ("Centralization of all actions . . . will allow for efficient coordination of briefing and rulings on motions to dismiss.").

3. *Centralization will reduce litigation costs and save the time and efforts of the parties, their counsel, and the Courts.*

Centralization will significantly reduce litigation costs and conserve the resources of the parties and the courts. It will enable a single federal court to establish a pretrial plan that minimizes the inconvenience and expenses of litigating all of these Actions individually, and it will allow plaintiffs' counsel "to combine their forces and apportion the workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a minimum of inconvenience to all concerned." *In re Baldwin-United Corp. Litig.*, 581 F. Supp. 739, 741 (J.P.M.L. 1984). For Defendants, centralization will ensure that they can concentrate their discovery efforts in a single court rather than across a growing number of district courts.

4. *The presence of Non-xAI Defendants does not undermine the efficiency benefits of consolidation.*

Though one pending Action also names Stability AI U.S. Servs. Corp. and Stability AI, Inc. as defendants does not undermine consolidation. If necessary, the transferee MDL court "can address unique issues using separate discovery tracks for each defendant or platform and employ separate motion tracks, to the extent necessary." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 637 F. Supp. 3d 1377, 1378 (J.P.M.L. 2022). Every Action, regardless of which additional defendant is named, alleges that Grok generated the CSAM at issue using a real child's photograph as its reference. Grok, and Defendants' design and deployment of it, is the common thread and root cause running through every Action, and it is the starting point for discovery and liability in every case, whether or not a particular complaint also names Stability AI over separate, narrower allegations concerning a different product's training data. This "common factual core warrants centralization despite the involvement of a number of different defendants." *In re FTX Cryptocurrency Exchange Collapse Litig.*, 677 F. Supp. 3d 1379, 1381 (J.P.M.L. 2023); *see also In re January 2021 Short Squeeze Trading Litig.*, MDL No. 2989, 2021 U.S. Dist. LEXIS 63656, at *6 (J.P.M.L. 2021) (centralizing actions "nam[ing] more than forty brokers, funds, and clearinghouses as defendants" where all actions involved common conduct concerning the Robinhood trading platform).

## II. THE WESTERN DISTRICT OF ARKANSAS WITH CHIEF JUDGE TIMOTHY BROOKS IS THE MOST SUITABLE FORUM.

Movant respectfully requests that the Panel centralize these cases in the Western District of Arkansas with Chief Judge Timothy Brooks. Eight (8) of the pending individual Actions are currently in Judge Brooks' Court. Approximately seventeen (17) of these plaintiffs causes of action stem from activities in the Western District of Arkansas, and fourteen (14) of the plaintiffs live in or around the Western District of Arkansas.

In selecting a transferee district, the Panel generally considers, among other factors, the location of parties, witnesses, and documents; where the largest number of actions is pending; the site of the occurrence of the common facts; the convenience and accessibility of the forum; and the experience of the proposed judge. *See* Manual for Complex Litigation (Fourth) § 20.131 (2004); *In re Educ. Testing Serv. Plt 7-12 Test Scoring Litig.*, 350 F. Supp. 2d 1363, 1365 (J.P.M.L. 2004) (selecting district where four of thirteen actions were already pending, the district offered an accessible location, and the assigned judge had complex-litigation experience); *In re Wheat Farmers Antitrust Class Action Litig.*, 366 F. Supp. 1087, 1088 (J.P.M.L. 1973) (considering convenience of parties and witnesses, location of documents, and stage of pretrial proceedings). These factors favor the Western District of Arkansas.

*First*, more of the currently pending Actions are filed in Arkansas than in any other state, and the vast majority of the currently pending Doe plaintiffs' claims stem from activities that occurred within the Western District of Arkansas. Exhibit A. Based upon information and belief, fourteen (14) of the Doe plaintiffs reside within the Western District of Arkansas. The Panel has repeatedly recognized that the concentration of pending actions in a particular state or district is itself a significant factor favoring transfer there. *See, e.g., In re Fosamax Prods. Liab. Litig.*, 444 F. Supp. 2d 1347, 1349–50 (J.P.M.L. 2006) (selecting transferee district where the substantial majority of actions were already pending); *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 560 F. Supp. 2d 1348, 1349 (J.P.M.L. 2008) (selecting transferee district in part because two of four filed actions were already pending there).

*Second*, the Western District of Arkansas is an accessible forum that currently hosts no pending MDLs, and Chief Judge Timothy L. Brooks is well suited to lead this litigation. Chief Judge Brooks has served as a United States District Judge for the Western District of Arkansas

since 2014 and has served as Chief Judge of that court since September 2025. He presides in Fayetteville, in the heart of Northwest Arkansas, a convenient and accessible venue for the parties, witnesses, and counsel involved in this litigation. As Chief Judge, he is well positioned to allocate the resources this litigation will require and to ensure its efficient management as the Actions, and the anticipated tag-along filings continue to grow.

Accessibility for an MDL does not require the transferee district to be located in one of the nation's largest cities. It requires a location that can be reached efficiently throughout the country. Specifically, the Panel's accessibility inquiry asks whether a location is "geographically central and readily accessible." *In re Deere & Co. Repair Servs. Antitrust Litig.*, 607 F. Supp. 3d 1350, 1351 (J.P.M.L. 2022). Fayetteville satisfies that criterion exceptionally well.

Fayetteville, Arkansas, where Judge Brooks presides, is a geographically central location that generally has direct flights to and from most major cities in the U.S. (ie. New York, Los Angeles, Chicago, Houston, Atlanta, Washington D.C., Denver, Dallas, Phoenix, Minneapolis, Charlotte, Miami, Orlando, Las Vegas, Tampa, Nashville, New Orleans, Detroit, Philadelphia, and Salt Lake City). The majority of the country's major legal and population centers are only a short flight—3.5 hours or less—away from Fayetteville.

## CONCLUSION

For the foregoing reasons, Movant respectfully requests that the Panel grant this Motion, transfer the actions identified in the accompanying Schedule of Actions, together with any subsequently filed tag-along actions, to the United States District Court for the Western District of Arkansas, and consolidate them for coordinated or consolidated proceedings before Chief Judge Timothy L. Brooks, pursuant to 28 U.S.C. § 1407.

Date: October 2, 2026

Respectfully Submitted,

**THE POTTS LAW FIRM**

*/s/ Derek H. Potts*_________
**Derek H. Potts**
dpotts@potts-law.com
**James Ryan Fowler**
rfowler@potts-law.com
**Emily B. Marlowe**
emarlowe@potts-law.com
3737 Buffalo Speedway, Suite 1900
Houston, Texas 77098
Phone: (713)963-8881
Facsimile: (913)583-5388

***Attorneys for Movant-Plaintiff***