**BEFORE THE UNITED STATES JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: ARTIFICIAL INTELLIGENCE MINOR SEXUAL EXPLOITATION LITIGATION | MDL Docket No. 3205 |

**JANE DOES' 1-3 AND JANE DOE'S OPPOSITION TO MOTION FOR TRANSFER OF ACTIONS UNDER 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

## I. INTRODUCTION

Plaintiffs Jane Does 1-2 and Jane Doe (collectively "Plaintiffs")—minor females—filed their actions against Defendants to enforce the laws of the United States and the State of Arkansas, as well as the common law, which were enacted to protect them from exactly the harm Defendants have caused them. Defendants' image-generating artificial intelligence model, Grok, created child sexual abuse material (i.e., ***child pornography***) from images of Plaintiffs and delivered the finished product—images and/or videos that depict them in various states of nudity or engaging in sexual activity—to at least one of its users.[1] Plaintiff Jane Doe 3, as the guardian and next friend of Plaintiffs Jane Does 1-2, filed suit against Defendants to remedy the harm caused to Plaintiffs Jane Does 1-2 when Defendants' models created the described child pornography of Plaintiff Jane Doe 3's minor daughters, and also to enforce Arkansas State Law and the common law as to herself because Grok likewise created "deepfake visual material" (i.e., pornography) using Plaintiff Jane Doe 3's images.

---

[1] *Jane Does 1-3 v. xAI et al,,* No 5:26-cv-05231-TLB (W.D. Ark) and *Jane Doe v. X.AI,* No. 5:26-cv-05232-TLB (W.D. Ark.) (together, the "Plaintiffs' Actions").

The Plaintiffs' Actions are two of nine currently-filed actions concerning Defendants' creation of child pornography depicting real, identifiable children, in the Western District of Arkansas—all of which were filed as individual actions. In addition to the actions filed in the Western District of Arkansas, there are five actions filed in the Northern District of California, one of which is an individual action arising from a different set of events than the W.D. Arkansas actions and the remaining four of which are putative class actions.[2]

Plaintiffs Jane Doe 1 (5:26-cv-05241-TLB), Jane Doe 3 (5:26-cv-5193-TLB), Jane Doe 4 (5:26-cb-05218-TLB), Jane Doe 5 (5:26-cv-05226-TLB), Jane Doe 6 (5:26-cv-05242-TLB, and John Doe (5:26-cv-05204-TLB) ("Movants") moved to transfer all fourteen (14) actions for coordinated or consolidated pretrial proceedings. Plaintiffs Jane Doe 1-3 (5:26-cv-05231-TLB), and Jane Doe (5:26-cv-05232-TLB) oppose this motion. Although the cases concern similar factual material and concern the same product, generally, the full set of pending actions are inappropriate for centralization under the current conditions. First, the factual questions presented by these cases are not necessarily common enough to warrant treatment together. Although some common questions will exist across all of the identified actions, the putative class actions present a far broader scope of fact and discovery issues that will not be shared by the individual actions. The individual actions concentrated in the Western District of Arkansas all concern a common Grok user, and therefore many issues concerning the use case, the product access points, and the safety controls—including whether they were reasonable and/or reasonably and effectively designed—can be limited to those product features utilized by that common Grok user. The putative class actions will also require investigation into those same issues, but for all possible product features that any users may have used while working with Grok to create child pornography depicting real, identifiable *children*. The gap between the

[2] *See* Exhibit A, Schedule of Actions.

similarity of class and individual claims widens even more considering that some of the actions are brought by child plaintiffs alongside adult plaintiffs.

Nothing presented by the cases on file demonstrates informal coordination is incapable of achieving the same efficiencies without the burden of Section 1407's formal transfer and consolidation. The fourteen cases are filed across just two districts and are related within each of those districts in front of the same judges (Chief Judge Timothy L. Brooks in the W.D. Ark and Judge P. Casey Pitts in the N.D. Cal.). In addition, the bulk of the individual actions are filed in the Western District of Arkansas, and all of the class actions are situated in the Northern District of California. This scenario does not present the risks Section 1407 was designed to avoid: duplicative discovery, conflicting schedules and rulings, heightened costs, and wasted resources. It is unlikely the two assigned judges will issue conflicting rulings or schedules in their dockets of related cases. Moreover, counsel for the parties in each of the districts have already demonstrated in court filings that informal coordination in these actions can resolve the remaining issues. Section 1407 offers a last resort procedural tool for bringing together actions presenting common questions of fact when the benefits of centralization outweigh the burdens. At this stage, that standard has not been demonstrated to justify transferring cases from their current jurisdictions.

Notwithstanding, in the event the Panel determines that centralization is warranted, Plaintiffs, alternatively, join Movants on one issue: the Western District of Arkansas is the appropriate transferee forum. The majority of cases are filed there, a great deal of the evidence and the parties are in that district, the Western District of Arkansas lacks any currently pending MDL cases, and it is centrally located and easily accessible from all parts of the country. Critically, Chief Judge Brooks has already begun coordinating these related cases in front of his docket and is in the best position to continue managing a centralized docket.

## II. BACKGROUND

### A. The Pending Actions

**Western District of Arkansas.** Nine related actions are pending in the Western District of Arkansas, all before Chief Judge Timothy L. Brooks. Six individual actions brought by Movants' counsel (the "Movants' Actions") were filed between August 6 and September 17, 2026. Dkt. No. 3-2. An additional action was filed by Movants' counsel on October 13, 2026. *Doe 2 v. X.AI,* No. 5:26-cv-05291. Two individual actions brought by Carney Bates & Pulliam, PLLC were filed in the Circuit Court of Benton County, Arkansas, on August 3, and August 4, 2026, and removed to the Western District of Arkansas on September 9, 2026. *Doe 1–3 v. X.AI*, No. 5:26-cv-05231, Dkt. No. 2 and *Doe v. X.AI*, No. 5:26-cv-05232, Dkt. No. 2 (the "Plaintiffs' Actions"). Each of these actions is an individual personal-injury action on behalf of a child and/or a parent. Chief Judge Brooks's docket links all of the actions as related. Notably, an additional case will be filed in the Western District of Arkansas by Carney Bates & Pulliam, PLLC, bringing the total related actions in the Western District of Arkansas to ten.

**Northern District of California.** Five Grok-related actions (for its creation of child pornography) are pending in the Northern District of California, all before Judge Pitts: *Jane Doe* (5:26-cv-00772), the earliest-filed putative class action (January 23, 2026); *Jane Doe 1–5* (5:26-cv-02246), a putative class action that also names Stability AI; *Jane Doe I* (3:26-cv-08567), a putative class action; *Jane Doe 1* (5:26-cv-09016), a putative class action; and *Jane Doe 1–3* (5:26-cv-09617), an individual action brought by Pennsylvania plaintiffs. *See* 5:26-cv-772-PCP, Dkt. No. 100.

The thirteenth action listed in Movants' Schedule of Actions, *John Doe 1–2 v. X Corp.* (3:26-cv-10913 (N.D. Cal.)), does not appear that it should be related. It is pending before Judge Rita F. Lin, and concerns X Corp.'s alleged failure to remove and report material on Twitter; it does not involve Grok or AI-generated material.

### B. Developments in the actions

On October 2, 2026, Plaintiff Jane Doe 1, 5:26-cv-05241-TLB, filed her Motion for Transfer of Actions Under 28 U.S.C. § 1407 For Coordinated or Consolidated Pretrial Proceedings ("Transfer Motion"). Defendants moved to stay the proceedings in all actions pending in the Western District of Arkansas on October 8, 2026. *See* Plaintiffs' Actions Dkts. 17. On October 22, 2026, Plaintiffs and Defendants in all of the Western District of Arkansas actions submitted their Joint Motion for Case Coordination to Judge Brooks, outlining their ability to coordinate the nine cases, and setting deadlines for filing amendments to the complaints as well as a briefing schedule for Defendants' anticipated motion to dismiss. *Id.* Dkt. 25. Chief Judge Brooks has not yet ruled on that motion.

The Northen District of California actions are likewise proceeding on a similar schedule. On September 22, 2026, Judge Pitts related the Grok actions before him (*see* 5:26-cv-772-PCP, Dkt. No. 79). On October 8, 2026, the parties filed a joint Rule 26(f) report and case management statement addressing the schedule, the anticipated consolidation of the class cases, and coordination with the related individual action. *Id.* Dkt. No. 85. The Court severed the claims against defendant Stability and ordered consolidation and coordination of those actions on October 23, 2026. *Id.* Dkt. No. 100.

## III. APPLICABLE LEGAL STANDARD

28 U.S.C. § 1407(a) imposes two independent requirements for centralization: (1) the actions must involve one or more common questions of fact, and (2) centralization must serve the convenience of the parties and witnesses and will promote the just and efficient conduct of the actions. *Uber Techs., Inc. v. U.S. Jud. Panel on Multidistrict Litig.*, 131 F.4th 661, 667, 670–71 (9th Cir. 2025). In evaluating the second requirement, the Panel considers four goals: avoiding duplicative discovery, preventing conflicting rulings and schedules, reducing costs, and conserving the resources of the parties, counsel, and the courts. *Id.*, 131 F.4th at 670.

Motions to centralize cases on the basis that they primarily present a common legal question generally do not justify Section 1407 centralization. *See In re Senior Health Ins. Co. of Pennsylvania Rehab. Plan Litig.*, 607 F. Supp. 3d 1348, 1349 (U.S. Jud. Pan. Mult. Lit. 2022) ("Common legal questions generally are insufficient to satisfy Section 1407's requirement of common factual questions."); *In re FCA US LLC "Letter 311" Lab. Cont. Litig.*, 778 F. Supp. 3d 1380, 1382 (U.S. Jud. Pan. Mult. Lit. 2025) (same). Thus, the moving party must demonstrate not merely factual overlap or a common legal issue, but that centralization is necessary to avoid duplicative proceedings, inconsistent pretrial rulings, or undue burdens on parties and witnesses—and that those benefits cannot be achieved through less intrusive alternatives.

Centralization is a measure reserved for cases in which its practical benefits outweigh the burdens it imposes. *See In re TrueCar, Inc., S'holder Derivative Litig.*, 412 F. Supp. 3d 1353, 1354 (J.P.M.L. 2019) ("The Panel has held that "centralization under Section 1407 should be the last solution after considered review of *all* other options.") (emphasis in original); *In re Camp Lejeune, N. Carolina, Water Contamination Litig. (No. II)*, 396 F. Supp. 3d 1368, 1369 (U.S. Jud. Pan. Mult. Lit. 2019) (denying centralization of 11 cases upon finding "[w]e are not persuaded that the potential benefits of centralization outweigh the inconvenience transfer would impose."); *In re: Dietgoal Innovations, LLC (%2C561) Pat. Litig.*, 999 F. Supp. 2d 1380, 1381 (U.S. Jud. Pan. Mult. Lit. 2014) (denying centralization of 22 cases based, in part, on the "heightened inconvenience that transfer may cause certain parties.").

That burden is particularly demanding when, as here, only a small number of actions and districts are involved. In those circumstances, the moving party bears a "heavier burden" to establish that centralization is warranted. *In re Transocean Ltd. Sec. Litig. (No. II)*, 753 F. Supp. 2d 1373, 1374 (J.P.M.L. 2010); *In re U.S. Postal Servs. Next Generation Delivery Vehicle Acquisitions Program Rec. of Decision Litig.*, 640 F. Supp. 3d 1410, 1411–12 (J.P.M.L.

2022); *see also In re Axon Enter., Inc., Body-Worn Camera & Digital Evidence Mgmt. Sys. Antitrust Litig.*, 776 F. Supp. 3d 1344, 1345–46 (J.P.M.L. 2025). Where the actions can be managed effectively in their existing courts, the mere prospect of some overlapping discovery or legal issues does not justify imposing the additional expense, delay, and procedural burdens of multidistrict litigation. *See In re Church of Jesus Christ of Latter-Day Saints Sexual Abuse Litig.*, 776 F. Supp. 3d 1356, 1358-59 (U.S. Jud. Pan. Mult. Lit. 2025) (denying centralization of 41 actions in nine districts because "informal coordination among counsel with respect to any common discovery of the Church ought to be feasible.").

## IV. LEGAL ARGUMENT

### A. The Small Number of Actions In Only Two Jurisdictions And the Current Coordination Efforts Demonstrate Centralization is Unnecessary.

This litigation does not present the dispersed, multi-forum docket that Section 1407 is designed to manage. The related actions, which concern Grok's AI model creating child pornography using images of real children, are pending in only two districts, and in each district the actions are already before a single judge, a scenario the Panel has declined to centralize. *In re SLB Enter. RICO Litig.*, 412 F. Supp. 3d 1350, 1352 (J.P.M.L. 2019); *see also In re Cooper Cos., Inc., In Vitro Fertilization Glob. Culture Media Prods. Liab. Litig.*, 753 F. Supp. 3d 1380, 1381 (J.P.M.L. 2024). Indeed, as the Panel has explained, "[t]he limited number of involved counsel" and a limited number of districts "suggest that cooperation and informal coordination are practicable alternatives to centralization." *In re Enhanced Recovery Co., LLC, Tel. Consumer Prot. Act (TCPA) Litig. (No. III)*, 278 F. Supp. 3d 1371, 1371–73 (J.P.M.L. 2017); *In re Samantha S. Kumaran Litig.*, 796 F. Supp. 3d 1375, 1376–77 (U.S. Jud. Pan. Mult. Lit. 2025) (finding informal cooperation and coordination adequate given the limited number of parties and courts and significant overlap); *In re CP4 Fuel Pump Mktg., Sales Pracs., & Prods. Liab. Litig.*, 412 F. Supp. 3d 1365, 1367 (U.S. Jud. Pan. Mult. Lit. 2019) (denying centralization of ten actions because informal coordination was practicable); *In re StockX Customer Data*

*Sec. Breach Litig.*, 412 F. Supp. 3d 1363, 1364 (U.S. Jud. Pan. Mult. Lit. 2019) (denying centralization of cases pending in three districts).

All nine related cases pending in the Western District of Arkansas are before Chief Judge Brooks. On October 22, 2026, the plaintiffs in those actions—including Movants—and Defendants jointly asked the Court to coordinate all pretrial proceedings in those cases, including by setting a schedule for filing amendments to the complaints and briefing xAI's anticipated motion to dismiss, and seeking a single discovery hearing. *See Doe v. xAI Corp. et al*, No. 5:26-cv-05232-TLB, Dkt. No. 25. In short, the parties have already put in place the core efficiencies Movants seek through centralization: one judge, one schedule, one round of briefing on common issues, and shared discovery.

The Northern District of California actions are similarly organized. On September 22, 2026, Judge Pitts related the Grok actions pending in that district, and on October 8, 2026, the parties in those actions filed a joint case management statement addressing the schedule, the anticipated consolidation of the related class cases, and coordination with the related individual action. *Jane Doe 1*; 5:26-cv-2246-PCP, Dkt. 72. While the parties there have differing views on certain scheduling questions, the filing reflects that the California actions are proceeding together before one judge, on one track. Moreover, On October 23, 2026, Judge Pitts consolidated and coordinated the claims against xAI for those five cases. *Id*. Dkt. No. 100.

Cross-district coordination is equally practicable. The cases are on similar trajectories; Defendants are represented by the same national counsel in both districts (*id.* Doc. 104 and Plaintiffs' Actions, Doc. 24), and counsel for plaintiffs in each district—as well as Judge Brooks and Judge Pitts—can reasonably coordinate on overlapping issues. The tools the Panel has long recognized as adequate alternatives to centralization—cross-noticing depositions, stipulating that discovery may be used across actions, sharing documents, and consultation between the transferor judges—are readily available here. *See In re Eli Lilly & Co. (Cephalexin*

*Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978); *In re Sorin 3T Heater-Cooler Sys. Prods. Liab. Litig.*, 273 F. Supp. 3d 1357, 1358 (J.P.M.L. 2017) (denying centralization where parties were already sharing discovery and informally coordinating). With only two courts involved, any overlap can be handled through these means.

Plaintiffs do not contend that centralization could never be appropriate. Rather, Plaintiffs' counsel believes it is "better to allow the parties' attempts to self-organize play out before centralizing any part of this litigation." *In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d 1376, 1378 (J.P.M.L. 2023). If circumstances change materially (such as expansion into additional districts or a breakdown of coordination) any party may renew its request, and denial now does not foreclose centralization later. *See In re Abbott Labs. & Bos. Sci. Corp. Spinal Cord Stimulator Prods. Liab. Litig.*, 835 F. Supp. 3d 1361, 1365 n.2 (J.P.M.L. 2026). At this stage, centralization is unnecessary.

### B. The class actions and the individual actions are fundamentally different kinds of litigation involving materially different scopes of discovery, and centralizing them would produce little efficiency

#### *1. The class actions will require substantially broader discovery and class certification proceedings that would delay the individual actions without producing corresponding efficiencies.*

The two groups of actions are not the same case filed in two places, and the differences are more than procedural. Of course, some discovery will naturally concern both the individual and the class actions, such as xAI's design and policy decisions in creating Grok's "spicy" mode, the safety measures and policies xAI considered and employed (or failed to consider and employ) to avoid creating child sexual abuse material in violation of federal and state law, and the material on which Grok was trained. These are discovery issues which coordination can easily manage. But the scope of discovery between the individual and class actions will vary significantly. On the one hand, the Western District of Arkansas actions are individual personal-injury actions brought on behalf of individual children under 18 U.S.C. § 2255 and Arkansas law. Each will focus on how Grok responded to a single user: what that user asked

Grok to do, how Grok responded, and how Grok came to generate abusive images of a particular child. These cases can therefore proceed through targeted discovery directed at the circumstances of that user's interactions with Grok and each child's injuries and the conduct giving rise to that child's claims.

On the other hand, the Northern District of California actions are, with one exception, putative class actions seeking certification of nationwide classes and subclasses, along with Rule 23(b)(2) and (c)(4) treatment. Those actions extend far beyond the experiences of any individual plaintiff or Grok user. They seek to address the claims of any and all users for whom Grok created and delivered this abusive material, and any and all children—regardless of age and circumstance—harmed by it, requiring discovery relevant to classwide issues under Rule 23. As the Panel has recognized, pairing a putative class action with individual actions may require the individual plaintiffs to participate in class certification discovery and motion practice that are "irrelevant to" the individual claims, thereby "diminish[ing]" any potential efficiencies of centralization. *In re Axon Enter., Inc.*, 776 F. Supp. 3d at 1345; *see also In re Express Scripts Holding Co. Sec., Derivative & ERISA Litig.*, 273 F. Supp. 3d 1369, 1371 (J.P.M.L. 2017) (finding case-specific issues and "putative classes not implicated in any other action" undermined alleged efficiencies).

That difference is especially pertinent here because it will dictate the discovery each group actually needs. Discovery in the Western District of Arkansas individual actions can be tailored to the unlawful content Grok generated for and delivered to the particular user who submitted the requests, including the method that particular user may have employed which resulted in Grok's understanding the requests, determining how to produce content responsive to the requests, and designing and illustrating child pornography depicting the Plaintiffs. Discovery in the class actions, by contrast, requires a substantially broader inquiry. In pursuit of the class claims, the NDCA Plaintiffs will likely investigate and seek discovery into every

conceivable method through which Grok created and delivered images of young children—real, identifiable children—in states of undress and/or engaging in sexual activity to the multiple users who have been and are currently working with Grok to generate this abusive visual material. Centralization would thus risk subordinating focused personal-injury litigation to a much larger discovery program and class-certification schedule, delaying resolution of the Plaintiffs' individual claims.

Centralization would not resolve that inefficiency simply by placing all the cases before one judge. Plaintiffs do not seek to lead or participate in the putative class claims, and counsel for the putative classes do not represent the individual Plaintiffs. The individual actions and class actions can therefore proceed on their respective tracks, with discovery tailored to the claims actually before each court. Forcing these actions into a single coordinated proceeding would require a transferee court to manage broad class-certification proceedings and disputes alongside individual personal-injury cases, adding complexity and delay without corresponding benefit. *See In re Depo-Provera Prods. Liab. Litig.*, 499 F. Supp. 2d 1348 (J.P.M.L. 2007) (denying centralization of a putative class action and individual personal-injury actions where common questions were not sufficiently complex or numerous and alternatives to transfer existed).

Keeping those roles separate also preserves the distinct responsibilities of class counsel. Under Rule 23, class counsel must fairly and adequately represent the interest of the class as a whole. *See* Fed. R. Civ. P. 23(g)(4). As the Ninth Circuit has explained, counsel's obligations to absent class members "does not permit even the appearance of divided loyalties of counsel". *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (quotation omitted) (requiring class counsel to step back from representing individual plaintiffs whose interest may differ from the class).

2. *The actions will present substantial case-specific questions of liability.*

Movants portray these actions as arising from a single product defect. That characterization assumes Grok operated as a uniform product, with uniform safeguards, that failed in the same way in every case. But the alleged conduct in the complaints involves a product that could be accessed through multiple channels—the public @Grok reply function on X, the standalone Grok application, and third-party applications built on licensed model access—and deployed alongside different safeguards, including (potentially) prompt filters applied before generation, methods to block the distribution of unlawful content after it was generated, or safety training built into the model itself.[3] The various users may have utilized different methods to request Grok to create and deliver the pornographic material: through multi-turn attacks[4] (repeating and rephrasing prompts until Grok complied), "roleplay" or "persona jailbreak"[5] prompting (submitting a specified prompt to evade or bypass safeguards), or by "many-shot jailbreaking"[6] (exploiting long context windows by filling a prompt with dozens or hundreds of fake dialogues). Any of these methods—depending on how well xAI designed Grok's safeguards (if at all)—could facilitate Grok's creation of child porn for users who upload real images of a child and asking Grok to create images or videos depicting them in states of full or partial undress or engaging in sexual activity.

On top of the subject matter differences, the relevant time periods also differ, and the model and its safeguards were changing throughout them. Not to mention that plaintiffs across

---

[3] *See Doe v. xAI Corp.*, No 5:26-cv-00772 (N.D. Cal.) ECF 1 at ¶ 30 (@Grok Reply); *id.* ¶ 29 (Grok App); *Doe v. X.AI Corp.*, No. 5:26-cv-002246 (N.D. Cal.) ECF No. 1 ¶¶ 40-41 (Grok App); *id.* ¶¶ 66-67, *Doe 1 v. X.AI Corp.*, No. 5:26-cv-08567 (N.D. Cal.) ECF No. 1 ¶¶ 97-99 (third party apps); 5:26-cv-00772, ¶ 63 (prompt filtering); 5:26-cv-09016, ¶ 48 (system prompt safety training).

[4] Mark Russinovich & Ahmed Salem, *Crescendo: A Quiet Crescendo in the Arms Race of LLM Jailbreaking*, ; (USENIX) (July 28, 2025), https://www.usenix.org/publications/loginonline/crescendo-quiet-crescendo-arms-race-llm-jailbreaking.

[5] Andy Zou et al., *Adversarial Attacks on Aligned Language Models*, Gray Swan Rsch. (July 2023), https://www.grayswan.ai/research/adversarial-attacks-on-aligned-language-models.

[6] Anthropic, *Many-Shot Jailbreaking* (Apr. 2, 2024), https://www.anthropic.com/research/many-shot-jailbreaking.

the cases include both children and adults, who present different factual and legal questions. In sum: which channel a perpetrator used, whether the channel and method were adequately protected, which safeguard he defeated, how he defeated it, whether that safeguard (as designed) was a reasonable method to facilitate compliance with federal child protection laws, and factual inquiries concerning the specific victims present potentially unique inquiries for each user for whom Grok created and delivered this unlawful content. These questions go to defect, causation, and fault, not just damages.

The Panel has declined centralization where liability turns on facts unique to each perpetrator and each victim. *See In re Hotel Indus. Sex Trafficking Litig.*, 433 F. Supp. 3d 1353, 1355–56 (J.P.M.L. 2020) (different ventures, witnesses, and time periods meant "unique issues concerning each plaintiff's . . . allegations" would predominate); *In re Church of Jesus Christ of Latter-Day Saints Sexual Abuse Litig.*, 776 F. Supp. 3d at 1358 (discovery "overwhelmingly will focus on unique, case-specific factual issues" where perpetrators, circumstances, and time periods differed and policies "undoubtedly changed"); *In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d 1376, 1378 (J.P.M.L. 2023) ("unique factual issues" about each plaintiff's abuse outweighed discovery into an alleged common scheme).

The Panel has also denied centralization where discovery would proceed on a location-by-location or incident-by-incident basis, even when the actions name a common defendant and share common legal theories. *See In re Tyson Foods, Inc., Meat Processing Facilities Fair Labor Standards Act (FLSA) Litig.*, 581 F. Supp. 2d 1374, 1375 (J.P.M.L. 2008) (denying centralization where discovery would proceed "plant-by-plant"); *In re Gap, Inc., COVID-19 Lease Payment Litig.*, 492 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020) (common issues were "limited and overshadowed by the many individual questions"); *In re Range View Mgmt., LLC Tel. Consumer Prot. Act (TCPA) Litig.*, 753 F. Supp. 3d 1375, 1376 (J.P.M.L. 2024) (common questions were "relatively straightforward," while substantial issues required individualized

discovery). The same is true here: the common questions about Grok's general design are likely to be accompanied by substantial case-specific discovery into each particular user, each access point, and each safeguard at issue in each action.

The actions also extend beyond a single product. One California action names Stability AI and alleges that a plaintiff's images were generated through a separate application built on Stability's open-weight model.[7] The Panel is "typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured and sold similar products," because each product has its own history and "[d]iscovery will not overlap concerning each manufacturer's conduct." *In re Abbott Labs. & Bos. Sci. Corp. Spinal Cord Stimulator Prods. Liab. Litig.*, 835 F. Supp. 3d 1361, 1364–65 (J.P.M.L. 2026) (quotation omitted). Centralization would place different AI systems, built by different companies with different safeguards, before one court without a corresponding gain in efficiency.

### C. The existing courts can coordinate common legal questions, and speculative future filings do not justify centralization.

Movants emphasize that these actions raise novel and important legal questions, including the application of 18 U.S.C. § 2255 to generative AI and whether an AI model is a "product" for purposes of products-liability law. Although WDAR Plaintiffs agree those questions are important, the presence of shared legal questions does not itself warrant centralization. "[M]erely to avoid [different] federal courts having to decide the same issue is, by itself, usually not sufficient to justify Section 1407 centralization." *In re Route 91 Harvest Festival Shootings in Las Vegas, Nev.*, 347 F. Supp. 3d 1355, 1357 (J.P.M.L. 2018) (quotation omitted); *accord In re Abbott Labs. & Bos. Sci. Corp. Spinal Cord Stimulator Prods. Liab. Litig.*, 835 F. Supp. 3d 1361, 1365 (J.P.M.L. 2026) (rejecting centralization premised on

[7] Although the NDCA severed the claims against Stability (*see Doe 1 et a v. xAI Corp. et al*, No. 5:26-cv-002246 Doc. 106), it is still included within the potential cases being considered for centralization. (MDL-3205, Doc. 3, Ex. A).

overlapping motion-to-dismiss practice). That principle applies with particular force here, where only two courts are involved and the parties in each have already organized briefing on common issues.

There is little to no risk of inconsistency in rulings. The cases are before two judges in two districts, where the type of claims (individual or class) are almost uniformly distributed between them, and both have submitted briefing schedules for the Court's approval which include single deadlines for motions to dismiss and uniform discovery schedules. Two district judges can readily account for each other's rulings, and the Panel has long recognized that "consultation and cooperation among the concerned district courts" can minimize the risk of conflicting decisions. *See In re Eli Lilly & Co. Patent Litig.*, 446 F. Supp. At 244; *In re Women's Clothing Antitrust Litig.*, 455 F. Supp. 1388, 1391 (J.P.M.L. 1978).

Nor does the possibility of additional filings justify centralization now. The Panel is "disinclined to take into account the mere possibility of future filings in [its] centralization calculus." *In re Belviq (Lorcaserin HCI) Prods. Liab. Litig.*, 555 F. Supp. 3d 1369, 1370 (J.P.M.L. 2021) (quotation omitted); *see also In re Express Scripts.*, 273 F. Supp. 3d at1371 ("the mere possibility of additional actions does not support centralization"); *In re Hotel Indus. Sex Trafficking Litig.*, 433 F. Supp. 3d at 1356. Moreover, aside from one similar action[8] filed, the recent filings in this litigation have been made in the two courts that already have related actions. New filings thus are joining existing coordinated proceedings rather than spreading the litigation to new forums.

Finally, denial now would not foreclose centralization later. If the litigation expands into additional districts, or if coordination between the two courts proves unworkable, any party

[8] A separate, unrelated action was also recently filed in Arkansas state court. *See Jane Doe, individually and as parent and next friend of Sarah Roe v. xAI Corp., xAI LLC, and Russel Edward Bloodworth*, No. 04-cv-26-5970 (Cir. Ct. Benton Cty.). Even if not removed, coordination with counsel in that matter should likewise be capable of ensuring efficiency.

may renew its request upon a significant change in circumstances. *See In re Women's Clothing*, 455 F. Supp. at 1391; *In re Abbott Labs.*, 835 F. Supp. 3d at 1365 n.2 (denial "does not foreclose the possibility that centralization may be appropriate at a later time"). For now, the parties and the two courts are fully equipped to manage this litigation without an MDL.

### D. Alternatively, the Western District of Arkansas is the appropriate transferee court

If the Panel concludes that centralization is warranted, the Plaintiffs join Movants in requesting that the Panel centralize this litigation in the Western District of Arkansas before Chief Judge Timothy L. Brooks. Every relevant consideration in selecting a transferee district—including where the actions are pending, where the injured parties and the evidence of their injuries are located, which court has already organized the litigation, docket conditions, and accessibility—favors the Western District of Arkansas. *See* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3864 (4th ed.). The Western District of Arkansas is not merely an acceptable forum—it is the hub for this litigation.

First, this litigation is concentrated in the Western District of Arkansas. More actions are pending there than in any other district: nine actions, all before Chief Judge Brooks, compared with only five in the Northern District of California. Approximately seventeen of the plaintiffs' claims arise from conduct directed at children in the Western District of Arkansas. The Panel routinely selects the district where the largest number of actions is pending. *See, e.g.*, *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 699 F. Supp. 3d 1396, 1399 (J.P.M.L. 2023) (selecting district where most actions were pending); *In re Fosamax Prods. Liab. Litig.*, 444 F. Supp. 2d 1347, 1349–50 (J.P.M.L. 2006). And the newest filings confirm the trend: the anticipated additional action to be filed by Carney Bates & Pulliam, PLLC will be in the Western District of Arkansas, bringing the total number of actions there to ten.

Second, most of the parties, witnesses, and evidence are in the Western District of Arkansas. Each action alleges that a real, identifiable child was harmed by images generated

of her. The facts that will distinguish one claim from another—who the perpetrator was, how he obtained and used images of the child, how the generated images were distributed, and the harm each child suffered—will be proven largely through witnesses and records located in Northwest Arkansas, including in Benton County. The Panel has long recognized that the district where the injury-producing events occurred and where the witnesses and records about those events are located is the natural transferee forum. *See In re Mid-Air Collision, Fairland, Ind.*, 309 F. Supp. 621, 622–23 (J.P.M.L. 1970) (selecting district where eyewitnesses and relevant evidence were located); *In re Air Crash Disaster at Gander, Newfoundland, on Dec. 12, 1985*, 633 F. Supp. 50, 52 (J.P.M.L. 1986) (selecting district where the victims were based and "pertinent witnesses and documents would be found"). Here, that district is the Western District of Arkansas.

Third, Chief Judge Brooks has already organized this litigation. All of the Arkansas actions are before Chief Judge Brooks, and the parties in those actions—including Defendants and Movants—have jointly proposed a coordinated schedule that provides for consolidated briefing, common protective and ESI orders, and coordinated discovery. The Panel gives significant weight to a court in which related actions are already "proceeding in an organized fashion." *In re TikTok, Inc., Consumer Privacy Litig.*, 481 F. Supp. 3d 1331, 1332 (J.P.M.L. 2020) (selecting district where actions were organized and the judge "ha[d] been actively managing them," even though defendants were headquartered elsewhere). Centralizing before Chief Judge Brooks would allow the litigation to build on that structure rather than start over. Chief Judge Brooks has served on the bench since 2014 and as Chief Judge since 2025, and as Chief Judge he is well positioned to allocate the resources this litigation may require.

Fourth, the Western District of Arkansas has no pending MDLs, and therefore has the capacity and accessibility this litigation requires. The Panel considers it a meaningful advantage when the transferee district "was not then burdened with another MDL docket." *In*

*re Comp. of Managerial, Prof'l & Tech. Emps. Antitrust Litig.*, 206 F. Supp. 2d 1374, 1376 (J.P.M.L. 2002); *see also In re Wireless Tel. 911 Calls Litig.*, 259 F. Supp. 2d 1372, 1373-74 (J.P.M.L. 2003) (selecting district that was centrally located and had resources to devote to the docket). Likewise, Fayetteville is geographically central, with direct flights to most major U.S. cities, and most of the country's legal centers are within a short flight. The Panel has repeatedly selected centrally located, accessible districts for nationwide litigation. *See In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Mktg., Sales Pracs. & Prods. Liab. Litig.*, 466 F. Supp. 3d 1380, 1382 (J.P.M.L. 2020) (Western District of Missouri was "centrally located and easily accessible").

Finally, the location of Defendants' headquarters does not favor a different forum. Even if Defendants maintain a presence in California, the Panel has selected transferee districts outside a defendant's headquarters when the actions are concentrated and organized elsewhere. *See TikTok*, 481 F. Supp. 3d 1331. Defendants' corporate discovery will consist predominantly of electronically stored information that can be produced in any forum, and transfer under Section 1407 does not require "that parties or witnesses travel to the transferee district" for depositions. *In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979*, 476 F. Supp. 445, 448 (J.P.M.L. 1979). The child-specific evidence that will drive most of these claims, by contrast, is in Arkansas and, contrary to the accessibility and transportability of evidence in Defendants' possession, presents a much more complex issue for the evaluation and introduction of evidence in this matter. *See* 18 U.S.C.A. § 2252 and § 2252A (prohibiting the transportation, receipt, distribution, reproduction, possession, or access-with-intent-to-view of child pornography and lacking an exception or exemption for civil attorneys, expert witnesses, or court personnel). Critically, even defense attorneys representing criminal defendants are prohibited from possessing or controlling evidence to be presented in the case against their

clients and must instead request and obtain access at government facilities. *United States v. O'Rourke*, 470 F. Supp. 2d 1049 (D. Ariz. 2007) (citing 18 U.S.C. § 3509(m)(1), (2)(B)).

In sum, no other district offers what the Western District of Arkansas already provides: the largest concentration of actions and injured children, a judge already managing a coordinated docket, and a court with the capacity to take on this litigation. If the Panel centralizes, it should do so in the Western District of Arkansas.

## V. CONCLUSION

Based on the foregoing, the Plaintiffs respectfully request that the Panel deny Movants' Motion to Transfer, or, alternatively, in the event the Panel concludes that centralization is warranted, the Plaintiffs respectfully request that the Panel select the Western District of Arkansas as the transferee district and assign the litigation to Chief Judge Timothy L. Brooks.

Dated: October 27, 2026

*/s/ Randall K. Pulliam*

Randall K. Pulliam (SBN 98105)
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
Tel: (501) 312-8500
Facsimile: (501) 312-8505
Email: rpulliam@cbplaw.com